# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **JAMES DYER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 14-cv-198-CVE-TLW** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

This matter is before the undersigned United States Magistrate Judge for a report and recommendation. Plaintiff James Dyer seeks judicial review of the Commissioner of the Social Security Administration's decision finding that he is not disabled. As set forth below, the undersigned recommends that the Commissioner's decision denying benefits be **REVERSED AND REMANDED IN PART and AFFIRMED IN PART**.

## INTRODUCTION

A claimant for disability benefits bears the burden of proving a disability. 42 U.S.C. § 423(d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). "Disabled" is defined under the Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To meet this burden, plaintiff must provide medical evidence of an impairment and the severity of that impairment during the time of his alleged disability. 20 C.F.R. §§ 404.1512(b), 416.912(b). A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically

acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). "A physical impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. The evidence must come from "acceptable medical sources," such as licensed and certified psychologists and licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a). A plaintiff is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

In reviewing a decision of the Commissioner, the Court is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. See Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395

F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. See White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

## BACKGROUND

Plaintiff, then a 32-year old male, protectively filed for Title XVI benefits on February 24, 2011, alleging a disability onset date of June 1, 2010. (R.118-23). Plaintiff claimed that he was unable to work due to anxiety, depression, and issues with his right arm and right eye. (R. 141). Plaintiff's claims for benefits were denied initially on July 6, 2011, and on reconsideration on October 19, 2011. (R. 53-60, 66-68). Plaintiff then requested a hearing before an administrative law judge ("ALJ"), and the ALJ held the hearing on October 3, 2012. (R. 25-52). The ALJ issued a decision on October 25, 2012, denying benefits and finding plaintiff not disabled because he was able to perform both his past relevant work and other work. (R. 9-24). The Appeals Council accepted new medical evidence but denied review, and plaintiff appealed. (R. 1-6; dkt. 2).

### The ALJ's Decision

The ALJ found that plaintiff had not engaged in substantial gainful activity since his application date. (R. 14). Plaintiff had severe impairments of major depressive disorder, post-traumatic stress disorder, and antisocial personality traits. Id. The ALJ found that plaintiff's complaints of arthralgia, glaucoma, and obesity did not rise to the level of a severe impairment. Id. To support this finding, the ALJ relied on the consultative physical examining physician's opinion that plaintiff had no abnormalities other than obesity. Id. Plaintiff's vision was corrected with glasses, and he used eye drops to treat glaucoma. Id. The ALJ determined that these impairments caused "no significant functional limitations." Id. Plaintiff also raised a complaint

of breathing problems at the hearing. Id. The ALJ found that the medical evidence did not support this claim and noted that plaintiff smokes a pack of cigarettes daily. Id.

Plaintiff's impairments did not meet or medically equal a listing. Id. The ALJ considered Listings 12.04, 12.06, and 12.08. Id. The ALJ also evaluated the severity of plaintiff's impairments using the "paragraph B" criteria. Id. The ALJ found that plaintiff had mild limitations in activities of daily living; moderate limitations in social functioning; and mild limitations in the area of concentration, persistence, or pace. (R. 15). Plaintiff had experienced no episodes of decompensation. (R. 15-16).

The ALJ then reviewed the testimony and medical evidence. (R. 17-19). Plaintiff testified that he has difficulty getting along with others. (R. 17). He has a history of short-term jobs and multiple incarcerations. Id. Physically, plaintiff has "floaters" in his eyes and cannot see well, even with glasses. Id. Driving is difficult because he sees things in the road that are not there. Id. Plaintiff's breathing problems started in 1997 while working in a warehouse. Id. Exposure to mold and dust caused him to develop bronchitis, which he treats with an inhaler. Id. Plaintiff spends all of his time at home, unless he drives his mother to work or visits his children. Id. He testified that he has no friends because "he has been antisocial throughout his life." Id. He also alleged that he hears voices every two to three minutes. Id.

Plaintiff's girlfriend completed a third party function report, in which she states that plaintiff is depressed, forgetful, anxious, and overwhelmed. Id. He has difficulty with written instructions, stress, and changes in routine. Id. His medications cause mood swings, shaking, drowsiness, and confusion. Id. She contends that plaintiff sometimes neglects his personal hygiene and relies on "TV dinners and snack foods" to feed himself. Id. Plaintiff also secludes

himself from others. Id. She further states that plaintiff's knees cause him a great deal of pain, limiting his ability to walk to a six-block distance. Id.

A physical consultative examination from May 2011 showed no abnormalities. Id. Plaintiff had a normal gait and normal heel/toe walking. Id. He was able to sit without difficulty. Id. Plaintiff's motor strength was good, and he had full range of motion in his spine, joints, and extremities. Id. The ALJ found that this report was "the only record fully evaluating the claimant's capacity for physical exertion." (R. 18). The ALJ noted that, despite the examining physician's diagnosis of arthralgias, plaintiff had no functional limitations. Id.

The mental consultative examining psychiatrist's report, also dated May 2011, notes that plaintiff is obese and reports sleeping twelve hours a day. (R. 17). The psychiatrist eliminated diagnoses of major depressive disorder, bipolar disorder, specific anxiety disorders, and personality disorders. (R. 17-18). Plaintiff did meet the criteria for "an adjustment disorder with mixed anxiety and depressed mood," and he exhibited antisocial personality traits. Id. The psychiatrist cited plaintiff's unemployment and financial issues as the cause for his adjustment disorder. (R. 18). He opined that plaintiff would improve in less than one year with behavioral counseling. Id.

The ALJ also reviewed the opinions of the non-examining agency physicians and gave them no weight. Id. The agency physician's physical residual functional capacity assessment limited plaintiff to light work. Id. However, the ALJ rejected that limitation on the basis that the medical evidence (the consultative examining physician's report) showed that plaintiff has full range of motion and good strength. Id.

The ALJ also rejected the mental residual functional capacity assessment and psychiatric review technique form as a basis for finding that plaintiff exhibits "behavioral extremes." Id. The

ALJ stated that plaintiff's counsel "promoted the concept of behavioral extremes in the claimant" in her questions to the vocational expert, despite the fact that the documents do not use the term. Id. The ALJ notes that the psychiatric review technique form cited plaintiff's mental health records, which showed "symptoms that are 'transient and expectable reactions to psychosocial stressors.'" (R. 18-19). The ALJ also cited the consultative mental examiner's report, which found that plaintiff did not have any disorders that would account for "behavioral extremes." (R. 19).

Based on this evidence, the ALJ also found that plaintiff was not credible. (R. 18). In support, the ALJ cited plaintiff's unsubstantiated complaints of arthritis in his right arm and breathing problems. Id. The ALJ also relied on inconsistencies between plaintiff's claims of severe mental impairments and anti-social behavior and the evidence that plaintiff had a live-in girlfriend, relationships with other family members, and the ability to use public transportation to visit his children. Id. The ALJ also found plaintiff not credible based on his poor work history, previous incarcerations for drugs and burglary, and his most recent incarceration for failure to make a monthly restitution payment. Id. Plaintiff claimed that he could not afford to pay $50 in monthly restitution, yet he continued to spend "well over that amount each month on cigarettes." Id.

The ALJ concluded that plaintiff retained the residual functional capacity to perform work at all exertional levels with the following nonexertional limitations: "no significant public interaction, no more than simple, routine tasks and some complex (e.g. semiskilled) tasks, and no more than occasional, superficial, and incidental work-related interaction with coworkers and supervisors." (R. 16).

Relying on the testimony of a vocational expert, the ALJ concluded that plaintiff could perform his past relevant work as a shop helper or salvage cutter. (R. 19). Alternatively, the ALJ concluded that plaintiff could perform other work as an industrial cleaner, hand packager, or candy spreader. (R. 20). Because plaintiff could perform his past relevant work or other work that exists in significant numbers in the national economy, the ALJ found plaintiff not disabled. Id.

## **The ALJ Hearing**

The ALJ held a hearing on October 3, 2012. (R. 24-52). Plaintiff testified regarding his work history, revealing that he had held a number of short-term jobs. (R. 30-34). Plaintiff testified that he dropped out of school in the eighth grade because he found the work difficult, even with special education classes in math and reading. (R. 35). Plaintiff also cited family abuse as a reason for dropping out of school. (R. 35-36).

Plaintiff testified that he uses eye drops every night to lower pressure in his eye. (R. 36). Even though plaintiff wears glasses, he still sees "floaters." Id. This issue made driving difficult because plaintiff would see things in the road that did not exist. (R. 36-37). He also experiences blurriness every other day for two or three minutes at a time. (R. 37). He experiences "a little" eye pain that he describes as "a little pressure in the back." Id.

Plaintiff also testified that he has a history of bronchitis dating back to 1997. (R. 38). He complained that dust and mold from warehouse environments and climbing steps causes trouble with his breathing. (R. 38). He recently used an inhaler. (R. 38-39).

Plaintiff admitted that he had not sought regular treatment because he did not have insurance or because he "just never really went or know how to go to a doctor about, you know, my little problems." (R. 39).

Transportation is not an issue. Id. When plaintiff cannot drive or have his girlfriend drive him somewhere, he takes the bus. (R. 39-40). Most days, however, he stays home. (R. 40). He does not shop for groceries because he struggles with price comparisons. Id. When he does leave the house, he drives his mother to work or visits his children. Id. He stays home because he does not "want to get in trouble" or "meet the wrong people." Id. Plaintiff has "trouble getting along with people" because he believes they are talking about him. Id. He testified that he has no friends. (R. 41). He also does not talk to people in crowds. (R. 42).

Plaintiff stated that he has been in prison four times. (R. 41). He was recently released from county jail for failure to pay monthly restitution. Id. Plaintiff testified that he could not afford to pay $50 per month because he does not have a job. (R. 42). Plaintiff admitted, however, that he smokes a pack of cigarettes daily. Id.

Plaintiff testified that he did get treatment at CREOKS to address stress and depression. Id. He was on medication, but he had side effects and stopped taking it on his own. Id. He believed that counseling was helpful because it gave him "somebody to talk to." (R. 43). He stopped treatment when he moved, and when he tried to re-enroll, "they asked for a Title 19." Id. Because plaintiff did not understand the paperwork, he "quit trying." Id.

Plaintiff reported that he has experienced auditory hallucinations since childhood. (R. 44). When he is alone, he hears things "every two or three minutes in a day." Id. Although he believed the medication helped eliminate the hallucinations, he did not like the side effects. Id.

The ALJ also took testimony from a vocational expert. (R. 46-53). She stated that plaintiff had past relevant work experience as a lawn mower, a salvage cutter, and a fabricating shop helper. (R. 47).

The ALJ then posed a hypothetical that reflected his written residual functional capacity findings – the ability to perform work at all exertional levels with nonexertional limitations to address plaintiff's mental impairments. Id. The vocational expert testified that plaintiff could perform his past relevant work as a salvage cutter and fabricating shop helper, but he would be unable to perform as a lawn mower based on the limitation on interaction with the public. (R. 47-48). He could, however, perform other, medium work as an industrial cleaner, a hand packager, and a candy spreader. (R. 48).

The ALJ posed a second hypothetical, similar to the first, but with additional limitations on occasional climbing, visual limitations, avoiding respiratory irritants, and working in "relative isolation." Id. The vocational expert did not believe that plaintiff would be able to perform any of those jobs, as even a housekeeper/cleaner position would require exposure to dust or chemicals. (R. 49).

Plaintiff's counsel asked the vocational expert to add an additional limitation to the first hypothetical to allow "for periodic behavioral extremes," such as "seeing or hearing things." (R. 50). The vocational expert testified that plaintiff would require a "sheltered workshop or a group enclave type setting." Id.

Plaintiff's counsel then asked the vocational expert to consider a hypothetical in which plaintiff could "perform simple work with no public contact and moderate expectations of extremes in behavior affecting coworkers." (R. 51). The vocational expert testified that plaintiff would be able to find work but would not be able to sustain employment. Id.

**Plaintiff's Medical Records**

Plaintiff sought mental health treatment at CREOKS in January 2010. (R. 209-36). At his intake session, a non-medical staff member screened plaintiff and set an appointment for an

assessment with a clinician. (R. 222-25). Plaintiff had his assessment in March 2010. (R. 226-34). The clinician, a Ph.D. and Licensed Clinical Social Worker, noted that plaintiff "appears to be a social, outgoing individual," although most of his friendships were formed in prison. (R. 227). Plaintiff reported that he wanted to find a job and learn to live outside of prison in an unstructured environment. (R. 226, 228, 230). He currently had the support of his fiancée, but he also had the added responsibility of an infant. (R. 229). The clinician diagnosed plaintiff with Adjustment Disorder with Anxiety and Primary Insomnia Disorder and assigned him a GAF score of 46. (R. 232-33). He opined that plaintiff "has a pleasant personality, and personable demeanor as strengths, and an inability to focus at times for a weakness." (R. 234). He recommended a weekly men's group and monthly counseling. Id. Plaintiff's prognosis was "fair to good" with treatment. Id.

Plaintiff never started treatment. He returned to CREOKS in January 2011. (R. 236). At that time, plaintiff complained of relationship problems with his fiancée, feeling uncomfortable around his daughter, insomnia, stress, isolation, and night sweats. Id. Plaintiff was diagnosed with post-traumatic stress disorder and prescribed Trazodone and Zoloft. Id. His last treatment note is dated March 2011. (R. 235). Plaintiff stated that he did not have the money to pay for Trazadone and that he stopped taking Zoloft after just a few days. Id. He complained of depression and of irritation whenever his daughter cried. Id. The doctor prescribed Cymbalta and Risperdal, but the treatment notes do not indicate whether plaintiff ever filled those prescriptions. Id. At the time of the hearing in October 2012, plaintiff's only medication was eye drops. (R. 208).

Aside from the consultative examining reports, which the ALJ discussed in detail, the record contains only the agency physicians' opinions and treatment notes for acute illnesses not related to plaintiff's alleged impairments.

The physician who completed the physical residual functional capacity assessment form limited plaintiff to light work with no visual or environmental limitations. (R. 270-77). In the comments section, the physician cited the consultative examining physician's report, noting that plaintiff was obese with a normal gait, normal strength, and no neurological deficits. (R. 277).

The psychologist who completed the mental residual functional capacity assessment and psychiatric review technique form found, based on the medical evidence in the record, that plaintiff was diagnosed with major depressive disorder and post-traumatic stress disorder by a treating physician. (R. 267). The agency psychologist gave weight to these diagnoses because the consultative examining psychiatrist did not have access to those records. Id. The agency psychologist also relied on the treating physician's records to conclude "within reasonable psychological probability that the MDI duration is 12 months or more, starting 6/2010 and continuing." Id.

The agency psychologist opined that plaintiff had moderate limitations in the areas of activities of daily living and concentration, persistence, and pace but marked limitations in the area of social functioning. (R. 265). He also opined that plaintiff had marked limitations with respect to detailed instructions and interacting appropriately with the general public and a moderate limitation in "the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes." (R. 251-52). In contrast to his finding that plaintiff had a marked limitation in concentration, persistence, or pace, the agency psychologist found that

plaintiff had no significant limitations, aside from carrying out detailed instructions, in those work-related tasks that require concentration. Id.

Following the ALJ's decision, plaintiff presented additional evidence, in the form of three sets of medical records, to the Appeals Council. (R. 1-6). The Appeals Council accepted the new evidence but found no reason to disturb the ALJ's decision. Id.

The first set of records covers various emergency room visits in 2005 and 2006 for urethritis, an inflammation of the urethra; a broken toe; and a hand laceration. (R. 290-312). All three of these injuries were acute and had no long-lasting effects. Id. The second set of records covers emergency treatment between December 2011 and August 2012. (R. 313-44). During this time, plaintiff was diagnosed with urethritis, lumbosacral strain, and bronchitis. Id. The third set of records covers emergency treatment between September 2012 and March 2013. (R. 345-72). Plaintiff sought treatment for right shoulder pain and bronchitis. Id. In each case, plaintiff was treated and released with medication. The records contain no evidence of follow-up treatment.

## ANALYSIS

On appeal, plaintiff raises four issues: (1) that the ALJ improperly reviewed the medical evidence; (2) that the ALJ erred at steps two through five by failing to include all of plaintiff's limitations in the analysis at each step; (3) that the ALJ did not conduct a proper credibility analysis; and (4) that the ALJ did not properly address plaintiff's obesity. (Dkt. 15).

### Medical Evidence

Plaintiff contends that the ALJ's finding that plaintiff did not have limits on exertional levels, respiratory irritants, or vision indicates that the ALJ erred in evaluating the evidence. Id. Plaintiff cites to the agency physicians' opinions, which found exertional limits based on plaintiff's obesity and degenerative joint disease. Id. Regarding plaintiff's breathing problems,

plaintiff points to the evidence submitted to the Appeals Council. Id. Plaintiff argues that the evidence of uncorrected vision and diagnosis of ocular hypertension demonstrates the existence of a severe vision impairment. Id.

With respect to plaintiff's mental impairments, plaintiff argues that the ALJ failed to weigh the GAF score from a treating physician. Id. Plaintiff also argues that the ALJ does not explain the weight she gave to the medical opinion evidence of plaintiff's mental impairments and mischaracterizes the evidence that plaintiff will exhibit "behavioral extremes." Id.

The Commissioner argues that the ALJ's findings at step two, including the findings regarding nonsevere impairments, are supported by substantial evidence. (Dkt. 16). The Commissioner also argues that the ALJ considered those nonsevere impairments at step four but decided, appropriately, not to include any functional limitations in the residual functional capacity findings. Id. The Commissioner contends that the ALJ gave good reasons for discounting the agency physician's opinion. Id. The Commissioner also contends that the new evidence accepted by the Appeals Council supports the ALJ's findings. Id.

**Nonsevere Impairments**

The ALJ found that plaintiff had no functional limitations resulting from arthralgias, glaucoma, obesity, or breathing problems; therefore, the ALJ concluded that these alleged impairments were nonsevere. (R. 14). Even if the undersigned presumed that plaintiff met his burden to establish that these impairments were severe, the Tenth Circuit has held that the failure to identify an impairment as a severe impairment at step two is harmless error if the ALJ proceeds to the next step in the sequential evaluation. See Carpenter v. Astrue, 537 F.3d 1264, 1266 (10th Cir. 2008); Hill v. Astrue, 289 F.App'x 289, 292 (10th Cir. 2008) (unpublished) [1];

---

[1] 10th Cir. R. 32.1 provides that "[u]npublished opinions are not precedential, but may be cited for their persuasive value."

Oldham v. Astrue, 509 F.3d 1254, 1256 (10th Cir. 2007). Accordingly, even if plaintiff's arthralgias, glaucoma, obesity, and/or breathing problems met the requirement for a severe impairment at step two, because the ALJ found that plaintiff had at least one severe impairment and then proceeded to step three, the error is harmless.

The regulations also require an ALJ to "consider all of [a claimant's] medically determinable impairments . . . including [] medically determinable impairments that are not 'severe'" in assessing residual functional capacity. 20 C.F.R. § 404.1545(a)(2). The Social Security Administration requires this analysis because "[w]hile a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may – when considered with limitations or restrictions due to other impairments – be critical to the outcome of a claim." SSR 96-8p. In this case, the ALJ also considered and discussed plaintiff's nonsevere impairments in assessing plaintiff's residual functional capacity. The ALJ concluded that plaintiff's nonsevere impairments posed no functional limitations. (R. 17-18).

The only remaining question, then, is whether the ALJ's findings regarding these nonsevere impairments are supported by substantial evidence. The ALJ relied on the physical consultative examination, which found that plaintiff had no physical abnormalities in his joints or extremities. (R. 17). Plaintiff's obesity did not impact his gait or range of motion. Id. The ALJ also noted the limited medical records available for review at the time of the hearing, as well as the fact that plaintiff had not sought treatment for his alleged breathing problems. (R. 18). Plaintiff's vision was normal with corrective measures, and he took eye drops to treat his condition. (R. 14).The undersigned finds that the ALJ cited substantial evidence to support the finding that plaintiff's arthralgias, glaucoma, obesity, and breathing problems cause no functional limitations.

**GAF Scores and Psychological Records**

Plaintiff argues that the ALJ erred in failing to discuss the medical records from CREOKS, including GAF scores of 48 and 47. (Dkt. 15). Plaintiff contends that the ALJ was required to discuss and weigh the opinion, including the GAF scores under SSR 06-03p and Administrative Message 13066 ("AM-13066"). Id.

The Commissioner argues that AM-13066 was not issued until nine months after the ALJ's decision, so the ALJ could not have applied the guidelines. (Dkt. 16). With respect to the GAF scores and the CREOKS medical records, the Commissioner argues that the agency psychologists, whose opinions the ALJ rejected, considered those records; therefore, the ALJ's reasoning is clear. Id. The Commissioner argues that the ALJ is not required to discuss GAF scores from a "non-acceptable medical source." Id. Additionally, the Commissioner argues that plaintiff is asking the Court to re-weigh the evidence and accept the opinions of the agency psychologists. Id.

The medical records at issue reflect that plaintiff initially sought treatment at CREOKS in January 2010 for help adjusting to life outside prison. (R. 222). The employee who performed the initial interview referred plaintiff for a psychological screening. Id. Plaintiff attended the screening in March 2010. (R. 223-34). The psychologist diagnosed plaintiff with "Adjustment Disorder with Anxiety" and "Primary Insomnia Disorder" and assessed the severity of plaintiff's impairments as "moderate." (R. 232-33). He also assigned plaintiff a GAF score of 46. (R. 233). Plaintiff did not receive any treatment after the screening.

Plaintiff returned to CREOKS in December 2010. (R. 210-20). At that time, a Licensed Processional Counselor assessed plaintiff with depressive disorder, assigned plaintiff a GAF score of 47, and recommended six months of group therapy and medication management. (R.

212, 213, 216-17). There are no additional records indicating that plaintiff ever received any treatment.

The ALJ did not discuss these records in her decision.

The Tenth Circuit does not require an ALJ to discuss GAF scores. See <u>Luttrell v. Astrue</u>, 453 F.App'x 786, 791-92 n. 4 (10th Cir. 2011) (unpublished). The Tenth Circuit also has repeatedly relied upon <u>Howard v. Comm'r of Soc. Sec.</u>, 276 F.3d 235, 241 (6th Cir. 2002), which holds that "[w]hile a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy."

In contrast to the relevant case law, AM-13066 is an internal agency document that "provides guidance to all State and Federal adjudicators (including administrative law judges) on how to consider Global Assessment of Functioning (GAF) ratings when assessing disability claims involving mental disorders." (Dkt. 16-1).[2] Accordingly, it is not binding on the Court. However, its recommendations lead the undersigned to conclude that, in this case, the GAF scores would be entitled to little or no weight. AM-13066 states that GAF scores "are not standardized," are "not designed to predict outcome," and "need supporting detail" to be useful. <u>Id.</u> AM-13066 states that a GAF score qualifies as a medical opinion only "when it comes from an acceptable medical source." <u>Id.</u> Additionally, "a GAF needs supporting evidence to be given much weight," and "[u]nless the clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis." <u>Id.</u> AM-13066 only requires the ALJ to weigh a GAF score and give reasons for that weight "[w]hen case evidence includes a GAF from a treating source and you do not give it controlling weight." <u>Id.</u>

_____

[2] The undersigned was not able to find AM-13066 online or in any of the Westlaw databases, but the Commissioner attached a copy to her brief. (Dkt. 16-1).

In this case, only one GAF score was assigned by an acceptable medical source, and that source does not qualify as a treating source because he only saw plaintiff on one occasion. See 20 C.F.R. § 416.927(c). Accordingly, even if AM-13066 were binding on the ALJ (rather than the "guidance" it professes to be), the ALJ was not required to weigh the GAF scores and explain his reasoning.

With respect to the medical records from CREOKS, although the ALJ did not discuss them, the undersigned finds that the ALJ did not err in failing to do so. "[A]n ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." Clifton v. Chater, 79 F.3d 1007, 1009-10 (10th Cir. 1996) (citation omitted). Although plaintiff testified that he received treatment at CREOKS, the records indicate that plaintiff never actually received treatment. Instead, plaintiff completed the intake process in early 2010, which included an interview with a non-medical staff person and an assessment from an acceptable medical source, a clinical psychologist. (R. 209-36). The psychologist diagnosed plaintiff with adjustment disorder with anxiety and insomnia, a diagnosis consistent with the findings of the consultative examining psychologist, who diagnosed plaintiff with adjustment disorder with mixed anxiety and depressed mood. (R. 232, 248). Under Clifton, the assessment and diagnosis contain no evidence that the ALJ would be required to discuss, as the diagnostic findings are consistent with other evidence in the record that the ALJ did rely upon in reaching her decision.

The only other records from CREOKS are dated January and March 2011, approximately one year after plaintiff's initial assessment. (R. 235-36). CREOKS prescribed medication for plaintiff based on a new diagnosis of PTSD, but the March 2011 note indicates that plaintiff did

not fill the prescription for one medication and took the second medication for "only a couple days." Id. Plaintiff complained of depression, anxiety, stress and irritation in dealing with his young daughter. Id. Again, plaintiff did not receive any real treatment, and these two progress notes do not contain any evidence that should have been discussed under the parameters of Clifton.

**Weight Given to Agency Physician Opinions**

Plaintiff argues that the ALJ did not adequately explain how she arrived at the conclusion that the agency physician opinions, including the residual functional capacity forms in the record, were entitled to no weight. (Dkt. 15). The Commissioner argues that the ALJ articulated good reasons for rejecting those non-examining opinions. (Dkt. 16).

The ALJ discussed the opinion of the consultative examining physician who conducted a physical examination of plaintiff, and the ALJ accepted that opinion. (R. 18). The ALJ noted that plaintiff's examination, including his range of motion, was normal and that the only abnormality was plaintiff's obesity, which did not impact his ability to move. Id. Despite this normal examination, the non-examining agency physicians who reviewed the records limited plaintiff to light work. Id. The ALJ rejected that limitation because the physical findings from the consultative examination did not support the limitation to light work and the administrative record contained no other medical records that would support such a limitation. Id.

The ALJ also rejected the mental residual functional capacity form and Psychiatric Review Technique Form completed by the non-examining agency psychologist. Id. The ALJ found that the forms were not "bases for a finding of behavioral extremes in the claimant" because "[n]either DDS record uses the term 'behavioral extremes' or any other similar phraseology." Id.

A review of these forms demonstrates that the ALJ was mistaken in her finding that the forms did not use the term "behavioral extremes." The mental residual functional capacity form contains a limitation for "[t]he ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes." (R. 252). The agency physician opined that plaintiff had a moderate limitation in this area, but in the narrative section stated that plaintiff "can adapt to a work situation" and "can relate to others on a superficial work basis with allowance for periodic behavioral extremes." (R. 253). Similarly, the Psychiatric Review Technique Form concluded that "[o]verall MER shows that clt can perform simple work with no public contact and moderate expectation of extremes in behavior affecting coworkers." (R. 267).

When there is no treating physician opinion, an ALJ "must explain in the decision the weight given to the opinion of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist. . . ." 20 C.F.R. §§ 404.1527(e)(2)(ii); 416.927(e)(2)(ii). See also Keyes-Zachary v. Astrue, 695 F.3d 1156, 1161 (10th Cir. 2012) (holding that when an ALJ does not give controlling weight to the treating physician's opinion, he must weigh all of the medical opinions).

The ALJ must evaluate those opinions using the same factors that would apply to the analysis of a treating physician's opinion. See 20 C.F.R. §§ 404.1527(c); 416.927(c). Those factors are as follows:

> (1) the length of the treating relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed, (3) the degree to which the physician's opinion is supported by relevant evidence, (4) consistency between the opinion and the record as a whole, (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

Watkins v. Barnhart, 350 F.3d 1297, 1301 (10th Cir. 2003) (citing Drapeau v. Massanari, 255 F.3d 1211, 1213 (10th Cir. 2001)). The failure to weigh each medical opinion may be considered harmless error only if the record establishes no "inconsistencies either among these medical opinions or between the opinions and the ALJ's RFC." Keyes-Zachary, 695 F.3d at 1161-62.

In this case, the ALJ was required to weigh the opinion of the agency psychologist using the applicable factors because plaintiff did not seek regular treatment for his mental impairments and had no treating psychologist/psychiatrist. The ALJ's mistake in reading these forms undermines the ALJ's sole stated basis for giving no weight to the agency psychologist's opinion. Further, the failure to properly weigh this opinion is not harmless error because the mental consultative examination and the ALJ's residual functional capacity findings contradict the agency psychologist's opinion that plaintiff would be subject to behavioral extremes that would moderately limit his ability to interact with his co-workers. Accordingly, the ALJ was required to address these conflicts and cite valid reasons, using the applicable factors, for rejecting the agency psychologist's opinion.

Additionally, plaintiff's counsel posed a hypothetical to the vocational expert in which plaintiff exhibited "behavioral extremes" for twenty percent of the workday. (R. 50). When the vocational expert asked for more specific information about the behavior that constituted "behavioral extremes," counsel posed a hypothetical in which the behavior manifested as audio and visual hallucinations. Id. The vocational expert testified that if the behavior distracted plaintiff's co-workers, plaintiff would likely require "a sheltered workshop or a group enclave type setting." Id. Plaintiff's counsel then asked the vocational expert to consider a limitation of "moderate expectation of extremes in behavior affecting coworkers" – the limitation set forth in

the Psychiatric Review Technique Form. (R. 51, 267). The vocational expert testified that such a limitation would impact plaintiff's ability to sustain employment. (R. 51).

The undersigned has reviewed the record and cannot find any evidence to support plaintiff's counsel's specific hypotheticals about the type of behavior (auditory and visual hallucinations) that qualifies as "behavioral extremes." The record also does not reveal any evidence that supports the notion that plaintiff is subject to "behavioral extremes." However, the law requires the ALJ, not the Court, to make that determination, particularly when the record contains contradictory medical opinions that the ALJ is required to weigh. For this reason, the undersigned recommends that the ALJ's decision be reversed and remanded for the ALJ to properly weigh the agency psychologist's opinion.

**Errors at Steps Two through Five**

Plaintiff contends that the ALJ failed to include all of plaintiff's limitations in her findings at steps two through five. (Dkt. 15). Specifically, plaintiff argues that the mild and moderate limitations in the ALJ's "paragraph B" findings are incompatible with the ALJ's step four conclusion that plaintiff can perform simple and some complex tasks. Id. Plaintiff also argues that the agency psychologist's opinion meets the requirements for a listing, demonstrating an error at step three. Id. At steps four and five, plaintiff contends that the ALJ did not include physical limitations from the agency physician's opinion or mental limitations from the agency psychologist's opinion; therefore, the ALJ's findings at steps four and five are not supported by substantial evidence. Id.

The Commissioner argues that plaintiff is asking the Court to re-weigh the medical evidence and include limitations that the ALJ properly found were entitled to no weight because they were not supported by the record evidence. (Dkt. 16).

The undersigned agrees with the Commissioner. The undersigned has already addressed plaintiff's arguments that the ALJ did not properly weigh the evidence and has recommended that the District Court affirm the ALJ's findings with respect to plaintiff's physical impairments and limitations and remand for the ALJ to conduct a proper analysis of the agency psychologist's opinion with respect to the issue of plaintiff's tendency to exhibit "behavioral extremes."

**Credibility**

Plaintiff contends that the ALJ's credibility analysis failed to consider plaintiff's activities of daily living, plaintiff's testimony, and plaintiff's failure to get treatment. (Dkt. 15). Plaintiff argues that the ALJ improperly relied on plaintiff's poor work history as a sign that plaintiff lacked credibility rather than as a sign that plaintiff had severe impairments that impacted his ability to work. Id. Plaintiff also argues that the ALJ ignored the impact of plaintiff's medication and their side effects and plaintiff's social limits. Id.

The Commissioner argues that the ALJ satisfied her duty to analyze plaintiff's credibility by listing several reasons, supported by substantial evidence, that plaintiff's testimony was not credible. (Dkt. 16).

This Court will not disturb an ALJ's credibility findings if they are supported by substantial evidence because "[c]redibility determinations are peculiarly the province of the finder of fact." Cowan v. Astrue, 552 F.3d 1182, 1190 (10th Cir. 2008) (citing Diaz v. Secretary of Health & Human Svcs., 898 F.2d 774, 777 (10th Cir. 1990)). Credibility findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Id. (citing Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988) (footnote omitted)). The ALJ may consider a number of factors in assessing a claimant's credibility, including "the levels of medication and their effectiveness, the extensiveness of the attempts . . .

to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, . . . and the consistency or compatibility of nonmedical testimony with objective medical evidence." <u>Kepler v. Chater</u>, 68 F.3d 387, 391 (10th Cir. 1995).

In this case, the ALJ listed several reasons that she found plaintiff not credible. First, the ALJ found that plaintiff's complaints of physical impairments were inconsistent with the record evidence. For example, plaintiff cited arthritis in his right arm in his application for disability, but he failed to mention any limitations at all resulting from arthritis in his testimony. (R. 18). Additionally, the physical consultative examination did not reveal any abnormalities or limitations stemming from arthritis. <u>Id.</u> Plaintiff also alleged severe mental problems; however, his own testimony reflected an ability to form long-lasting relationships with his girlfriend and children and his ability to use public transportation without issue. These activities of daily living contradicted his claims that he was unable to participate in any social activity. <u>Id.</u> Plaintiff also gave inconsistent statements about his financial instability, indicating that he prioritized the purchase of cigarettes over meeting his financial obligations to pay restitution for previous crimes. <u>Id.</u> Finally, the ALJ relied on plaintiff's history of incarceration and poor work history as proof that plaintiff was not credible. <u>Id.</u>

The ALJ's reasons for finding plaintiff not credible are all proper credibility considerations. <u>See</u> <u>Kepler</u>, 68 F.3d at 391 (citing the frequency of medical contact, activities of daily living, and discrepancies between a claimant's testimony and the objective medical evidence). <u>See</u> <u>also</u> <u>Bolton v. Barnhart</u>, 117 F.App'x 80, 85 (10th Cir. 2004) (unpublished) (affirming an ALJ's credibility findings that relied, in part, on a claimant's criminal history); SSR 96-7p (citing work history as a proper factor in assessing a claimant's credibility).

Plaintiff's remaining arguments that the ALJ failed to consider additional evidence in weighing plaintiff's credibility are without merit because a proper credibility finding does not require "a formalistic factor-by-factor recitation of the evidence." Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir. 2000). The ALJ's credibility findings need only be supported by substantial evidence in order to be affirmed. See Diaz, 898 F.2d at 777. The ALJ met her burden. Accordingly, the undersigned finds that the ALJ did not err in assessing plaintiff's credibility.

**Obesity**

Plaintiff argues that the ALJ failed to properly consider plaintiff's obesity. (Dkt. 15). Plaintiff contends that, although the ALJ found plaintiff's obesity to be nonsevere, the ALJ erred in failing to discuss the impacts of plaintiff's obesity in the residual functional capacity findings. Id. Specifically, plaintiff contends that the ALJ ignored the agency physician's findings, plaintiff's testimony, and the third party function report, all of which demonstrated that plaintiff's obesity limited his ability to work. Id.

The ALJ is required to consider all limitations, including those that are not severe, in making his findings regarding a claimant's residual functional capacity. See 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2). The Tenth Circuit has held that when an ALJ finds that an impairment is non-severe at step two, he must still include some discussion at step four in order to satisfy the courts that he has properly considered any limitations arising from that impairment. See Wells v. Colvin, 727 F.3d 1061, 1064-65 (10th Cir. 2013). As to plaintiff's obesity, "[a]n ALJ must consider 'the combined effects of obesity with other impairments' and 'evaluate each case based on the information in the case record.'" Arles v. Astrue, 438 Fed.Appx. 735, 740 (10th Cir. 2011) (quoting SSR 02-1p) (unpublished).

The ALJ did discuss plaintiff's obesity at step four. Specifically, the ALJ noted that plaintiff's obesity was the only "abnormality" found during plaintiff's consultative physical examination. (R. 18). Despite plaintiff's obesity and a diagnosis of "arthralgias of multiple joints," the ALJ noted that the objective medical evidence demonstrated that plaintiff has a normal range of motion, normal strength, normal gait, and no difficulty with sitting and standing. Id. This lack of objective medical evidence is sufficient to support the ALJ's finding that plaintiff's obesity does not cause any functional limitations. To the extent that plaintiff argues the ALJ should have found that plaintiff's physical complaints were credible and related to his obesity, the undersigned has already addressed the ALJ's credibility findings and recommended a finding of no error.

Plaintiff also contends that the third-party function report from his girlfriend supports a finding that his obesity caused limitations that should have been included at step four. The third-party function report contains mention of two issues that could be related to plaintiff's obesity: pain in plaintiff's knees that limits his ability to walk more than six blocks and poor sleep habits. (R. 17, 164-72).

SSR 06-03p states that the ALJ must consider evidence from "'non-medical sources' who have not seen the individual in a professional capacity in connection with their impairments, such as spouses, parents, friends, and neighbors." For these sources, "it would be appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence." Id. That Ruling also acknowledges, however, that there is a distinction between what an ALJ must consider and what an ALJ must explain. See SSR 06-03p. Specifically, the Ruling states that for those "other source" opinions that do not require discussion, the ALJ "generally should

explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." Id.

To the extent that plaintiff argues that the ALJ should have considered the third-party function report in assessing plaintiff's obesity, the undersigned finds that the ALJ's evaluation of the third-party function report was proper. In this case, the ALJ was not required to discuss the third-party function report completed by plaintiff's girlfriend because it has no "effect on the outcome of the case." SSR 06-03p. The ALJ considered plaintiff's obesity at step four and cited objective medical evidence to support her conclusion that plaintiff's obesity did not impose any physical limitations on plaintiff's ability to work. (R. 17). The ALJ went above and beyond the legal requirements in weighing the third-party function report. See SSR 06-03p.

Moreover, the ALJ's reasoning for giving little weight to the third-party function report was proper. The ALJ found that the report was entitled to little weight because plaintiff's girlfriend lived with plaintiff and was "not likely to be objective." (R. 17). The ALJ also noted that plaintiff's girlfriend reported doing most of the household work, a fact that could be attributed as much to plaintiff's recent incarceration than to any physical limitations. Id. These findings are permissible under the guidelines set forth in SSR 06-03p, which allows the ALJ to consider "the nature and extent of the relationship" and the consistency of the report compared to other evidence. SSR 06-03p.

For these reasons, the undersigned recommends a finding that the ALJ properly considered the impact of plaintiff's obesity.

## RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that the Commissioner's decision in this case be **REVERSED AND REMANDED IN PART and AFFIRMED IN PART**. On remand, the ALJ should conduct a proper analysis of the agency psychologist's opinions, particularly with respect to the portion of the opinion which provides that plaintiff's mental impairments will give rise to occasional "behavioral extremes" that would impact his co-workers. The undersigned further <u>RECOMMENDS</u> that the ALJ's decision be <u>AFFIRMED</u> on all remaining points of error.

## OBJECTION

In accordance with 28 U.S.C. §636(b) and Fed. R. Civ. P. 72(b)(2), a party may file specific written objections to this report and recommendation. Such specific written objections must be filed with the Clerk of the District Court for the Northern District of Oklahoma by August 4, 2015.

If specific written objections are timely filed, Fed. R. Civ. P. 72(b)(3) directs the district judge to determine *de novo* any part of the magistrate judge's disposition to which a party has properly objected. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions. <u>See</u> <u>also</u> 28 U.S.C. § 636(b)(1). The Tenth Circuit has adopted a "firm waiver rule" which "provides that the failure to make timely objections to the magistrate's findings or recommendations waives appellate review of factual and legal questions." <u>United States v. One Parcel of Real Property</u>, 73 F.3d 1057, 1059 (10th Cir. 1996) (quoting <u>Moore v. United States</u>, 950 F.2d 656, 659 (10th Cir. 1991)). Only a timely specific objection will preserve an issue for *de novo* review by the district court or for appellate review.

SUBMITTED this 21st day of July, 2015.

_____

T. Lane Wilson
United States Magistrate Judge